IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| ENCOMPASS HOME & AUTO INS. CO., | * | |
| Plaintiff, | * | |
| v. | * | Civil No. TJS-12-2588 |
| COREY HARRIS, *et al.*, | * | |
| Defendants. | * | |

                             *      *      *      *      *      *

## MEMORANDUM OPINION

Plaintiff Encompass Home & Auto Insurance Company ("Encompass") brought this action seeking a declaratory judgment that its insurance policy with the Defendants Nicole Saunders Harris ("Mrs. Harris") and Corey Harris ("Mr. Harris") (collectively, the "Defendants") is void *ab initio*. (ECF No. 1.) The Defendants filed a counterclaim against Encompass alleging breach of contract. (ECF No. 13.) This Memorandum Opinion and the Judgment that accompanies it address Encompass's claim and the Defendants' counterclaim.

## I.   PROCEDURAL BACKGROUND

On April 15, 2014, with the consent of the parties, this matter was referred to the undersigned for all proceedings. (ECF Nos. 39, 41 & 42.)  On October 2, 2014, a one-day bench trial was conducted. (ECF No. 55.) On October 16, 2014, both parties submitted proposed findings of fact and conclusions of law. (ECF Nos. 57 & 58.)  The Court has carefully considered the exhibits admitted into evidence (Exhibits 1-17), the testimony of the witnesses (Jayne Clark, Michele Grossman, April Rakowiecki, and Andrew Schlegel), and the written submissions of the parties.  For the reasons set forth below, the Court awards Encompass the declaratory relief sought in the Complaint and further finds that Encompass is not liable to the Defendants for

breach of contract. Pursuant to Rule 52 of the Federal Rules of Civil Procedure, the Court's findings of fact, legal analysis, and conclusions of law are set forth separately below.

## II.    FINDINGS OF FACT

1.     Jayne Clark ("Ms. Clark") is an insurance agent employed by Donadio Insurance Group.  Ms. Clark is licensed by the State of Maryland to sell insurance.

2.     Mrs. Harris is a client of the Donadio Insurance Group. She has previously obtained insurance for a condominium located at 3623 Glengyle Avenue, Baltimore, Maryland 21215 (the "Glengyle Property") and three automobiles through Donadio Insurance Group with Encompass.

3.     On or about August 2, 2011, Mrs. Harris and her husband, Mr. Harris, purchased certain real property located at 2700 Classen Avenue, Baltimore, Maryland 21215 (the "Classen Property") through a foreclosure sale for $7,500.00.

4.     Approximately nine months after the Defendants' purchase of the home, on May 1, 2012, Mr. Harris called Ms. Clark to obtain insurance for the Classen Property.  Ms. Clark requested photographs of the property from Mr. Harris.

5.     On May 2, 2012, Mr. Harris emailed Ms. Clark and said that he could not take photographs of the Classen Property "due to not having a working camera at the moment." (Exhibit 10 at 2.)

6.     Ms. Clark never received any photographs of the Classen Property from either of the Defendants.

7.     Mr. Harris told Ms. Clark that certain renovations to the Classen Property had been completed, and that he and Mrs. Harris intended to make the Classen Property their primary residence.

8.      Mr. Harris told Ms. Clark that he got "a really good deal" on the purchase price for the Classen Property. Ms. Clark did not ask Mr. Harris for the purchase price of the Classen Property. Mr. Harris did not disclose that he paid $7,500.00 for the Classen Property in a foreclosure sale.

9.      Ms. Clark asked Mr. Harris a series of questions to evaluate the replacement cost value of the Classen Property (to thereby calculate a property damage limit of insurance), including questions about the flooring, fireplace, kitchen countertops and bathrooms in the house.

10.      Mr. Harris told Ms. Clark that the home was updated, including the heating and cooling systems.

11.      Ms. Clark looked at a photograph from the Google Maps website (https://www.google.com/maps) taken from the outside of the Classen Property.  She observed that the roof was bent down and that it was missing shingles.  She also observed that the steps were in need of repair.

12.      Mr. Harris told Ms. Clark that he had fixed the roof by re-tarring it but that the steps still needed repair.

13.      Based on the information provided by Mr. Harris, Ms. Clark used the Encompass estimator program to generate a replacement cost value quote for the Classen Property of $180,000.00.

14.      Mr. Harris told Ms. Clark that he and Mrs. Harris were finishing painting at the Classen Property and were moving into the property as their primary residence.

15.     On May 18, 2012, Ms. Clark emailed a "quote" to Mr. Harris for insurance coverage reflecting that the Classen Property was now the primary residence of the Defendants, and that the Glengyle property was their secondary residence.

16.     On May 21, 2012, Mrs. Harris emailed Ms. Clark about "the new monthly amount." Thereafter, Mrs. Harris wrote to Ms. Clark: "Ok this is doable.  I would like to move forward with this transaction and you can make it effective for today." (Exhibit 10 at 18.)

17.     After Mrs. Harris agreed, Ms. Clark uploaded the application and emailed an unsigned application to Mr. Harris.

18.     In the application, the Classen Property was referenced to be added as the primary dwelling and owner-occupied by the Defendants.  The Glengyle Property was now a secondary property. (*See* Exhibit 5 at 135, 140 & Exhibit 6 at 167, 177) (stating that the "usage type" for the Classen Property was "primary" and the "usage type for the Glengyle Property was "secondary" and "seasonal").

19.     In the application, the "Residential Replacement Value" for the Classen Property was $180,000.00 with a $500.00 deductible.

20.     On May 22, 2012, Ms. Clark prepared a final and correct application to be signed by Mrs. Harris as the insured.  Ms. Clark sent the signature pages of the application to Mrs. Harris. (*See* Exhibit 6.) After reviewing the final application, Mrs. Harris stated that she had "two concerns why is Glengyle not listed in the summary with the cars and Classen and why is my last name still listed as Saunders?" (Exhibit 10 at 23.)

21.     In a June 5, 2012 email from Mrs. Harris to Ms. Clark, Mrs. Harris wrote: "I am going to sign the pages with signatures and email them back to you is that ok." (Exhibit 10 at 24.)

22.     In a June 8, 2012 email from Mrs. Harris to Ms. Clark, Mrs. Harris wrote: "[s]orry the pages are upside down.  Can you let me know that you have received these? Thanks." (Exhibit 10 at 27.)

23.     Ms. Clark received the signed application signature pages from Mrs. Harris dated "5/5/12." Mrs. Harris intended to date the application signature pages for June 5, 2012, but mistakenly dated them for May 5, 2012. (Exhibit 6 at 169-70, 173-76, 179 & 181.)

24.     In signing the application for insurance for the Classen Property, Mrs. Harris acknowledged that she had "read the[] entire application . . . before signing" and that the statements made on the application were "correct and true." (Exhibit 6 at 174; *see also* Exhibit 10 at 23.)

25.     The Defendants did not disclose to Ms. Clark that they had purchased the Classen Property for $7,500, an amount approximately ten-times less than it had sold for the previous year.

26.     Based on the representations of Mr. Harris, Ms. Clark believed that the Classen Property was recently renovated and up to code.

27.     Ms. Clark knew that Encompass required that a subject property like the Classen Property had to be owner-occupied in order to be insured by Encompass.

28.     Ms. Clark knew from her discussions with Mr. Harris that, at the time of the application, the Classen Property was not the primary residence of the Defendants. She also knew that it was not owner-occupied by the Defendants at that time.

29.     Ms. Clark believed that the Classen Property was going to be owner occupied by the Defendants within a "couple weeks" from the date of the application.

30.     Ms. Clark did not personally visit or physically inspect the Classen Property.

31.     Ms. Clark submitted information to Encompass indicating that the Classen Property was owner-occupied.

32.     Ms. Clark "re-built" the homeowner application and submitted the signed application to Encompass.

33.     The Classen Property was added to the insurance policy (Number 239828292) by means of endorsement (the "Policy") effective May 21, 2012 with a replacement cost value of $180,000.00.

34.     On June 19, 2012, a fire occurred at the Classen Property. The Defendants did not learn of the fire until June 23 or 24, 2012. (*See* Exhibit 11 at 1, Exhibit 12 at 5-6 & Exhibit 13 at 6.)

35.     Ms. Clark had no further involvement with the Defendants until after the Classen Property fire. After the fire, Mr. Harris spoke with Ms. Clark about a claim report for the fire loss. Ms. Clark informed Mr. Harris that there would be an investigation of the fire, and that she would need copies of all of his receipts for the work that he had done to the Classen Property. Mr. Harris advised Ms. Clark that this would not be a problem, and that he "had everything."

36.     Mr. Harris emailed Ms. Clark on November 14, 2012. (Exhibit 10 at 31.) In his email he referred to his recollection of a conversation that had taken place between him and Ms. Clark during the application process. He recalled discussing the Classen Property and the merely "cosmetic" improvements left to be completed. Ms. Clark recalls this portion of the conversation. Ms. Clark denies ever having been told, however, that the Defendants had purchased the property for less than ten-times the amount of what had been paid for it the previous year by another owner.

37.     Michele Grossman ("Ms. Grossman") is a Senior Claims Representative employed by Encompass in its Special Investigations Unit.

38.     Ms. Grossman had "concerns" about the Defendants' claim for the fire loss at the Classen Property. These concerns were based on the following, which the Court finds as facts: that the property was a "newly added" endorsement; that the property was vacant and unoccupied at the time of the fire; that the property was "void of all contents"; that the insurance coverage for the property had been acquired approximately one year after the purchase of the property, but only about two weeks before the fire; and that the cause of the fire was determined to be incendiary.

39.     Ms. Grossman viewed pictures of the Classen Property from May 25, 2011 (prior to the foreclosure sale purchase of the property by the Defendants). The pictures showed that the property's front windows were covered with boards, that the kitchen contained no appliances, and that the bathroom had outdated plumbing and fixtures.

40.     Ms. Grossman concluded that the Classen Property was empty in May 2011 and that it was not occupied prior to its purchase by the Defendants in August 2011.

41.     Ms. Grossman concluded that there were no utilities, no kitchen fixtures or appliances, and no personal items or property belonging to the Defendants inside the Classen Property on June 19, 2012, the date of the fire.

42.     After the fire, Ms. Grossman met with the Defendants to discuss their claim.  Mr. Harris said that the utilities were never turned on at the Classen Property; that neither he nor his wife had resided at the Classen Property; that the only thing he did to improve the property was some roofing work to waterproof the roof; and that a decision had not been made about whether or not the Defendants would move into the Classen Property.

43.     Encompass does not provide insurance under residential insurance policies unless the subject property is owner occupied. (Exhibit 1, Sec. IV, Pt. A) ("With the exception of renter's coverage, only owner occupied risks are eligible.").

44.     Ms. Grossman visited the Glengyle Property after the fire. The property showed no signs of having been vacated by the Defendants.

45.     The Defendants had not vacated the Glengyle Property at the time of their application to Encompass.

46.     Encompass's underwriting guidelines require that the market value of an insured property cannot be less than 70% of the current replacement cost. (*See* Exhibit 1, Sec. IV, Pt. D.)

47.     The market value of the Classen Property at the time of the application was approximately $7,500.00, which is the purchase price paid by the Defendants at the foreclosure sale. Under Encompass's underwriting guidelines, Encompass will not issue a homeowners insurance policy with a replacement cost of $180,000.00 for a property with a market value of $7,500.00. (*See* Exhibit 1, Sec. IV, Pt. D) (indicating that a dwelling with a "market value (excluding land) of under 70% of current replacement cost" qualified as an "unacceptable hazard" and an "ineligible exposure").

48.     The Defendants misrepresented the condition of the Classen Property to Ms. Clark and Encompass in the application process.

49.     The Defendants misrepresented that the Classen Property had been renovated and that they were going to occupy the Classen Property as their primary residence during the application process.

50.     If Encompass had known the price that the Defendants had paid to purchase the Classen Property, as well as the condition of the property, and that it was not owner occupied,

Encompass would not have issued a policy of insurance based on its own underwriting guidelines.

51.     On August 9, 2012, Encompass sent a denial of claim letter to the Defendants. (Exhibit 13 at 6-7.)

52.     On August 17, 2012, Encompass sent a "Material Misrepresentation" notice to Mrs. Harris, which served to void the endorsement to the Policy that added coverage for the Classen Property. (Exhibit 13 at 8-9.) The notice stated that the Defendants had misrepresented in their application that the Classen Property was their primary home, that it was owner-occupied, and that "had Encompass known of the true nature of the Classen Avenue property, it would not have issued a policy of homeowner's insurance" to the Defendants. (*Id.*)

53.     In the notice, Encompass stated that the reason for the decision to void the endorsement of the Classen Property was that its "INVESTIGATION HAS REVEALED THE FOLLOWING: THE ENDORSEMENT WAS OBTAINED THROUGH MATERIAL MISREPRESENTATION, FRAUD OR CONCEALMENT OF MATERIAL FACT." (*Id.* at 8.)

54.     The Policy provides that losses that occur in connection with a person who has "(1) Concealed or misrepresented any material factor circumstance; or (2) Engaged in fraudulent conduct; or (3) Made false statements relating to this insurance; whether as to eligibility or claim entitlement" are not covered. (Exhibit 2, "Your Policy.")

55.     The Policy permits Encompass to "cancel" the policy of insurance at any time "if there has been a material misrepresentation of fact which if known to [Encompass] would have caused [it] not to issue the policy. . . ," among other reasons. (*Id.* at page 1 of 3.)

56.     The Policy defines "Residence Premises" as a "dwelling, condominium, co-operative unit or apartment, other structures and grounds . . . where you reside and which is shown as your residence in the Coverage Summary." (*Id.* at page 2 of 24.)

57.     Ms. Clark did not advise Encompass that the Defendants were not residing at the Classen Property or that the Classen Property was vacant at the time of the application and electronic submission to Encompass.

58.     April Rakowiecki ("Ms. Rakowiecki") is a Product Management Consultant employed by Encompass.  She has 23 years of experience as an underwriter for Encompass and is familiar with Encompass's underwriting rules and procedures.

59.     The application submitted by Mrs. Harris indicates that as of the date of the application, the Classen Property is the primary residence of the insured and that the home is owner occupied. (Exhibit 6.)

60.     The application submitted by Mrs. Harris does not show a market value for the Classen Property. (*Id.*)

61.     Encompass's underwriting rules require the applicant for insurance to occupy the subject property to obtain insurance. Unoccupied properties are ineligible for insurance coverage from Encompass. (*See* Exhibit 1, Sec. IV, Part A) ("With the exception of renter's coverage, only owner occupied risks are eligible.")

62.     From at least the date of the application to the time of the fire, there were no utilities connected to the Classen Property and the property was not occupied by the Defendants or any other person.

63.     Because the Defendants' insurance application, as submitted to Encompass by Ms. Clark, included inaccurate information that had been supplied by the Defendants,

Encompass issued an endorsement adding coverage for the Classen Property to the policy. (Exhibit 2.)

64.     Encompass relies on its agents to obtain accurate information from insurance applicants. In this case, Encompass relied upon its agent, Ms. Clark, to obtain accurate information from the Defendants.

65.     Ms. Clark provided information to Encompass that the Classen Property type was "Dwelling-Primary"; that the property had undergone heating system renovations in 2011; that it had received a roof renovation in 2011; that it had received a wiring renovation in 2009; and, that it had received a plumbing renovation in 2009. (*See* Exhibit 17 at 4.) Ms. Clark obtained this information from the Defendants.

66.     The Encompass estimator program estimated a replacement cost value of $168,223.00 for the Classen Property. Using additional agency factors, Encompass determined the replacement cost value of the property to be $180,000.00.

67.     Andrew Schlegel ("Mr. Schlegel") was accepted as an expert witness on the origin and cause of fires.

68.     Mr. Schlegel was hired by Encompass to investigate the June 19, 2012 fire at the Classen Property.

69.     Mr. Schlegel went to the Classen Property on June 26, 2012 to investigate the original cause of the fire. Mr. Harris was present during Mr. Schlegel's visit.

70.     On the date of Mr. Schlegel's inspection, the heat pump was missing at the Classen Property.

71.     On the date of Mr. Schlegel's inspection, the kitchen had no appliances at the Classen Property.

72.     On the date of Mr. Schlegel's inspection, the natural gas line was capped at the Classen Property and there was no natural gas service.

73.     On the date of Mr. Schlegel's inspection, there was no electrical service at the Classen Property.

74.     On the date of Mr. Schlegel's inspection, there were no utilities servicing the Classen Property.

75.     On the date of Mr. Schlegel's inspection, there were no personal items located inside the Classen Property.

76.     Mr. Schlegel's expert opinion is that the cause of the June 19, 2012 fire at the Classen Property was incendiary with combustible materials and the origin was on the first floor steps leading to the second floor.

77.     Mr. Schlegel's expert opinion is that the fire was intentionally set and not an accidental fire. Mr. Schlegel does not know who started the fire at the Classen Property.

78.     The Court accepts as fact Mr. Schlegel's opinion as to the cause and origin of the fire.

79.     There is insufficient evidence to support a finding that the Defendants caused the fire at the Classen Property on June 19, 2012.

## III.     LEGAL ANALYSIS AND CONCLUSIONS OF LAW

### A.     The Declaratory Judgment Act

Under the Declaratory Judgment Act, a district court "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). The Declaratory Judgment Act is "an enabling Act, which confers a discretion on the courts rather than an absolute right upon the litigant." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 287 (1995). In general, a district court should entertain a

declaratory judgment action "when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and . . . when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Penn-America Ins. Co. v. Coffey*, 368 F.3d 409 (4th Cir. 2004) (internal quotation omitted).  When a related state court proceeding is pending, however, a court must consider four factors (the "*Nautilus* factors") in determining whether to proceed with the declaratory judgment action in federal court:

> (1) whether the state has a strong interest in having the issues decided in its courts; (2) whether the state courts could resolve the issues more efficiently than the federal courts; (3) whether the presence of "overlapping issues of fact or law" might create unnecessary "entanglement" between the state and federal courts; and (4) whether the federal action is mere "procedural fencing," in the sense that the action is merely the product of forum-shopping.

*Coffey*, 368 F.3d at 412 (citing *United Capitol Ins. Co. v. Kapiloff*, 155 F.3d 488, 493-94 (4th Cir. 1998) (quoting *Nautilus Ins. Co. v. Winchester Homes, Inc.*, 15 F.3d 371, 377 (4th Cir. 1994))).

In consideration of the *Nautilus* factors, the Court finds that entertaining this action is appropriate and "will serve a useful purpose in clarifying and settling the legal relations in issue." *Id*. at 412.

### B.   Choice of Law

Subject matter jurisdiction in this case is predicated on the diversity of the parties.  A federal court sitting in diversity must apply the choice of law rules applicable in the forum state. *Klaxon v. Stentor Electric Mfg. Co., Inc.*, 313 U.S. 487, 496-97 (1941).  In the absence of a choice of law provision in a contract, Maryland generally follows the doctrine of *lex loci contractus* when determining which state's substantive law to apply to the interpretation of a contract for insurance.  *Francis v. Allstate Ins. Co.*, 709 F.3d 362 (4th Cir. Mar. 7, 2013); *Am. Motorists Ins. Co. v. ARTRA Group, Inc.*, 338 Md. 560, 659 A.2d 1295, 1301 (1995).  Under the

*lex loci* principle, the law of the place where the contract was made governs. *Rouse Co. v. Fed. Ins. Co.*, 991 F. Supp. 460, 462 (D. Md. 1998). "[A] contract is 'made' where the last act necessary for its formation is performed." *Id.* For an insurance policy, the last act necessary for formation of the contract is the delivery of the policy and payment of premiums. *Id.*; *Commercial Union Ins. Co. v. Porter Hayden Co.*, 97 Md. App. 442, 630 A.2d 261 (1993) (vacated on other grounds).

In this case, the contract was entered into in Maryland. In addition, the policy at issue states that it is "issued in accordance with the laws of the state of Maryland and. . . . the laws of Maryland shall govern any and all claims or dispute in any way related to this policy." (*See* Exhibit 2, "What law will apply and where lawsuits may be brought.") The Court finds that Maryland law governs this case.

## C.     Insurance Policies Void *Ab Initio*

A court may declare an insurance policy void *ab initio* if it finds that an insurer issued a policy in reliance on a material misrepresentation in the application. *See Scottsdale Ins. Co. v. Nat'l Ctr. On Insts. & Alts., Inc.*, No. WDQ-04-2356, 2005 WL 1367079, at *2 (D. Md. June 7, 2005) (citing *North American Specialty Ins. Co. v. Savage*, 977 F. Supp. 725, 728 (D. Md. 1997)). "A court must engage in a two-pronged inquiry to determine whether the insurer may validly rescind the policy." *Fitzgerald v. Franklin Life Ins. Co.*, 465 F. Supp. 527, 534 (D. Md. 1979). First, the court must determine whether a misrepresentation occurred. *Id.* Second, the court must "determine whether the misrepresentation was material to the risk assumed by the insurer." *Id.*

Considering the first prong, the Court finds that the Defendants made several misrepresentations to Encompass. In general, the Defendants misrepresented to Encompass that the Classen Property was in "move-in" condition, that they had completed a number of

renovations, and that the property was their primary residence. As set forth above, the Classen Property was not in a habitable condition (and certainly not in the condition that the Defendants described to Encompass), and the Defendants did not use the property as their primary residence. The Court also finds that the Defendants' failure to disclose the purchase price of the Classen Property to Encompass constitutes a material misrepresentation, particularly when considered in connection with the Defendants' other misrepresentations about the condition of the property.

Moving on to the second prong, the Court finds that the Defendants' misrepresentations were "material to the risk assumed" by Encompass. "A fair test of the materiality of a fact is . . . whether reasonably careful and intelligent men would have regarded the fact, communicated at the time of effecting the insurance, as substantially increasing the chances of the loss insured against." *Metro. Life Ins. Co. v. Samis*, 172 Md. 517, 192 A. 335, 338 (1937). The Defendants' misrepresentations were material in two ways. First, the misrepresentations were material to Encompass's estimation of the replacement cost value of the property. The misrepresentations led Encompass to estimate that the replacement cost value of the property was higher than it was – $180,000.00 instead of a closer estimation of its market value, which was approximately $7,500.00. Second, the misrepresentations were material to Encompass's decision to issue the policy in the first place. Had Encompass known that the property was owner-occupied, it would not have issued the policy. Even if Encompass had chosen to issue the policy, in violation of its underwriting guidelines and internal procedures, the misrepresentations nonetheless "would reasonably have affected [Encompass's] determination of the acceptability of the risk." *Nationwide Mut. Ins. Co. v. McBriety*, 246 Md. 738, 744, 230 A.2d 81, 84 (1967).

The Court finds that the Defendants are responsible for these misrepresentations[1] and that Encompass had no obligation under the circumstances to conduct an investigation before issuing the Policy. Encompass has not waived its right to void the policy *ab initio*. *See Fitzgerald,* 465 at 535 ("Maryland law still imposes a heavy burden on the applicant to be responsible for all statements in or omissions from the application submitted by him."); *N. Am. Specialty Ins. Co. v. Savage*, 977 F. Supp. 725, 731 (D. Md. 1997) ("The duty to investigate . . . only exists in extraordinary situations when the insurer is on notice that some type of investigation is necessary because a considerable amount of suspicious information is presented to the insured.") (Internal quotation omitted). Accordingly, Encompass did not waive its right to rescind the Defendants' Policy, and is not otherwise estopped from voiding the Policy. Encompass is entitled to a declaration that the Policy is void *ab initio* as to the Classen Property.

### D.      Breach of Contract

The Defendants have asserted a counterclaim for breach of contract. The Defendants assert that the Policy requires that Encompass provide insurance coverage for the loss to the Classen Property, and that Encompass has failed to do so. Because the Court finds that the Policy on the Classen Property has been properly voided *ab initio* by Encompass, there is no valid contract to be enforced. Accordingly, Encompass is not liable to the Defendants on this claim.

### IV.      CONCLUSION

For the reasons set forth above, Encompass is entitled to the following declaration, which it sought in its Complaint: Policy Number 239828292, which originally insured the Defendants'

---

[1] In reaching its ruling, the Court need not reach the issue of whether Ms. Clark was complicit with the Defendants in making misrepresentations to Encompass about the condition and value of the Classen Property.

home at 3623 Glengyle Avenue and to which the Defendants' property at 2700 Classen Avenue was added by endorsement, is void *ab initio* with respect to the Classen Property.


<u>March 17, 2015</u>                   <u>      /s/                  </u>
Date                                             Timothy J. Sullivan
                                             United States Magistrate Judge